UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X
                               :

RAFER ROKEACH d/b/a DOUBLE          :
R WELDING, INC.,                         :
                       Plaintiff,    :

-v -                   :

HANOVER INSURANCE COMPANY,      :
                     Defendant.   :
                               :
--------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/19/15

1:13-cv-5011-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, District Judge:

## I.     INTRODUCTION

      Hanover Insurance Company denied the plaintiff's claim for $80,000 in losses arising from a series of thefts on the plaintiff's property. While Hanover acknowledges that the losses were covered by its policy, it argues that the policy's deductibles provision precludes the plaintiff from obtaining any recovery. The deductibles provision requires the payment of a $1,000 deductible for each "occurrence" that gives rise to a loss. Hanover argues that each of the multiple instances of theft was a separate "occurrence," and that the plaintiff cannot prove that the loss in any one occurrence exceeded the $1,000 deductible, which, in Hanover's view, bars all recovery. The plaintiff argues, among other things, that the series of thefts on his property should be treated as a single occurrence, subject to a single deductible. Because the Court finds that the meaning of the undefined term "occurrence" used in the deductibles provision of this first party property insurance policy is ambiguous, the Court denies the defendant's motion for summary judgment.

## II.     BACKGROUND

      a.   *The Theft*

      The plaintiff, Mr. Rafer Rokeach d/b/a Double R Welding, Inc., operates a welding business in Uniondale, New York. Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl. Resp. 56.1")

at ¶ 1.  The plaintiff stored a considerable amount of metal in an ungated yard on his property.  *Id.* at ¶ 2.

Mr. Rokeach's business was robbed in the summer of 2011.  Mr. Rokeach first noticed that material had been stolen in mid-June, when one of his employees pointed out that a scrap bin was empty.  Defendant's Response to Plaintiff's Rule 56.1 Counterstatement ("Def. Resp. 56.1") at ¶ 1, 2.  After he discovered the theft, the plaintiff inspected the property and found that he was missing a "massive amount of material."  *Id.* at ¶ 2.  Mr. Rokeach's inspection also revealed to him that the thieves had staged additional material for future removal by dragging some items from one end of his property to the other.  *Id.* at ¶ 5.  Mr. Rokeach later testified that he believed that multiple people and multiple loads were required to remove the stolen materials from his property.  Pl. Resp. 56.1 at ¶ 9.

Mr. Rokeach reported the theft of materials from his property to the police.  Def. Resp. 56.1 at ¶ 6.  Then he spoke with his neighbors, who told him that they had heard noise late at night on his property for "a few weeks."  Pl. Resp. 56.1 at ¶ 5; Def. Resp. 56.1 at ¶ 6.  According to Mr. Rokeach, while the neighbors had heard loud noises on the property at night over a period of weeks, "[t]hey never thought anything of it because sometimes I work around the clock."  Deposition of Mr. Rafer Rokeach ("Rokeach Dep.") at 103:9-11; Def. Resp. 56.1 at ¶ 7.  One neighbor, a former police officer, told Mr. Rokeach that about a week before Mr. Rokeach reported the theft to the police, the neighbor's wife had heard a lot of noise in a short period of time, and then that they had seen a truck with a trailer come into the property.  Rokeach Dep. at 132:18-133:13; Pl. Resp. 56.1 at ¶ 8.

Another neighbor, who lives 200 feet from Mr. Rokeach's property, provided even more detail regarding the thefts.  He stated that he saw the same two men on Mr. Rokeach's property on four separate occasions, starting in the middle of June 2011.  Affidavit of Peter Arrichio, Ex. 3 to

Affidavit of Roman Rabinovich ("Arrichio Aff."), Docket No. 43, at ¶¶ 2-6.  He saw the two men taking metal goods from Mr. Rokeach's property and loading it into a pickup truck; they used the same pickup truck on each occasion.  *Id.*  Mr. Arrichio says that it took the men "approximately an hour each to take the items over the course of a couple trips per instance."  *Id.* at ¶ 5.  Like Mr. Rokeach's other neighbors, Mr. Arrichio did not think that the men were thieves, believing, instead, that they were they working for Mr. Rokeach.

Once they were alerted to the series of thefts from Mr. Rokeach's property, Mr. Rokeach's neighbors were "very upset."  Rokeach Dep. at 52:20-25.  They began to look after the property.  *Id.*  Mr. Arrichio, in particular, realized that the men he had observed on Mr. Rokeach's property were thieves.  Arrichio Aff. at ¶ 10.  The next time that Mr. Arrichio saw the men on the property, he called the police, and they were arrested.  *Id.* at ¶ 11.  The arrest occurred on July 21, 2011.  Def. Resp. 56.1 at ¶ 8.[1]

    b. *The Claim*

After the thieves were arrested, on July 21, 2011, Mr. Rokeach reported his losses to his insurance provider, Hanover Insurance Company, the defendant in this case.  Declaration of Christopher Tivnan ("Tivnan Aff."), Docket No. 36, at ¶ 3.  Mr. Rokeach claimed reimbursement for his losses under a business owner's policy issued by Hanover on November 11, 2011, which covered the period from February 22, 2011 to February 22, 2012.  Pl. Resp. 56.1 at ¶ 13.  As described in more depth below, the policy provided broad coverage for both property losses and claims for liability against the plaintiff's business.

The plaintiff submitted a sworn proof of loss on May 15, 2012, claiming $80,000 in covered losses from the theft on his property.  Tivnan Aff. at ¶ 5, Ex. 3.  Mr. Rokeach provided a hand

---

[1] There is some inconsistency on the record regarding the precise date of the arrest.  Mr. Arrichio affirmed that the date was July 1, 2011.  Arrichio Aff. at ¶ 11.  According to the testimony of Mr. Rokeach, however, the police report regarding the incident correctly stated July 21, 2011 as the date of the incident.  Rokeach Dep. at 114:8-13.

written inventory of the stolen property, consisting of $77,722.16 of his own property and $3,247.18 of property belonging to others.  Def. Resp. 56.1 at ¶ 10.  The plaintiff prepared that inventory of stolen goods after the thefts occurred, using replacement cost values based on the original purchase price of the items that he identified as stolen.  *Id.* at ¶ 11.

Hanover ultimately denied the plaintiff's claim.  In a letter dated June 11, 2012, Hanover explained the basis for its decision as follows:

> We have determined that the materials stolen happened over time with several trips/occurrences.  Each occurrence of theft is a separate claim subject to a separate deductible.  Based on the load tickets provided by the NYPD, the value of each load falls below the $1000 policy deductible.  Accordingly, we will be unable to issue any payment for the damages sustained.

Tivnan Aff. Ex. 4.  Hanover separately asserted that the plaintiff's lack of a written inventory of his property prior to the loss was a basis for its decision not to reimburse the claim.  Def. Resp. 56.1 at ¶ 17.  At the same time, Hanover acknowledges that its policy does not expressly require that an insured person maintain an inventory.  *Id.* at ¶ 18.  This case turns, therefore, on Hanover's interpretation of the deductibles provision of its policy—and, in particular, the meaning of the term "occurrence" as it appears in that provision of the policy.

     c.  *The Policy*

Hanover's insurance policy provides coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss, except as limited or excluded within this policy form . . . ."  Ex. 5 to Tivnan Aff. (the "Policy") Businessowners Coverage Form at p. 4 of 66.  The covered property includes "Business Personal Property located in or on the buildings . . . or in the open (or in a vehicle) within 1000 feet of the described premises."  *Id.*  "Theft" is a covered cause of loss under the Policy.  *Id.* at p. 46 of 66.  It is not disputed that the stolen property, located in the open at the plaintiff's premises, was covered by the Policy; nor is it disputed that the plaintiff was the victim of a theft covered under

4

the Policy.  None of the Policy's limitations or exclusions apply to the plaintiff's claim.  *Id.* at pp. 6, 31-36 of 66; Deposition of Christopher Tivnan, Ex. 1 to Rabinovich Aff. ("Tivnan Dep.") at 138:16-18 ("theft is not excluded in the policy and theft is a covered cause of loss.").

The Policy limits the amount that it will cover for losses or damage:  "The most we will pay for loss or damage in any one 'occurrence' is the applicable Limit of Insurance shown in the Declarations."  Policy, Businessowners Coverage Form at p. 36 of 66.  Hanover does not, however, argue that the amount of the plaintiff's claim exceeded the amount of coverage provided for theft under the policy.

Instead, the basis for Hanover's decision not to reimburse the plaintiff rests on the Policy's deductibles provision.  That provision of the Policy reads as follows:

> We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations.  We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance . . . .

*Id.* at p. 37 of 66.  The deductible amount applicable to theft under the Policy's declarations is $1,000.  Policy, Businessowners Declaration at p. 1 of 2.

The Policy defines the term "occurrence" as follows:

> "Occurrence" means all loss or damage that is attributable directly or indirectly to:
> a.   One cause, act, event, or a series of similar, related causes, acts or events involving one or more persons; or
> b.   One cause, act or event, or a series of similar related causes, acts or events not involving any person.

Policy, Businessowners Coverage Form at p. 45 of 66.  However, as Hanover points out, the Policy also states that "words and phrases that appear in quotation marks have special meaning."  Policy, Businessowners Coverage Form at p. 4 of 66.[2]  And the term "occurrence" in the deductibles

---

[2] The Policy points the reader to "Paragraph H. Property Definitions in Section I-Property . . . ."  Policy, Businessowners Coverage Form at p. 4 of 66.  The Court notes that the reference should properly be to Paragraph G.  *Id.* at p. 42 of 66.

provision of the Policy does not appear within quotation marks.  As a result, Hanover argues that the term "occurrence" as used in the deductibles provision of the policy must be read in a way that does not permit a series of related events to be treated as a single "occurrence."

At oral argument on this motion, the parties stipulated on the record that the laws of the State of New York apply to the interpretation of the Policy.  Rightly so, given that the Policy was written in New York to insure a property and business located in New York.

### III.  PROCEDURAL HISTORY

The Plaintiff served a summons and complaint on the defendant in this action on June 24, 2013.  The defendant removed the case from the Supreme Court of New York, New York County, to this Court on July 18, 2013.  The case was reassigned to the undersigned on April 17, 2014, and the Court put in place a case management plan and scheduling order on May 13, 2014.  After conducting discovery, the defendant filed this motion for summary judgment on February 18, 2015. The motion was fully briefed on March 12, 2015.

### IV.  LEGAL STANDARD

The Plaintiff in this case is entitled to summary judgment on a claim if he can show that "there is no genuine issue as to any material fact and that [defendant is] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To defeat a motion for summary judgment, the defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e))(emphasis removed).  "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010) (citations and internal quotations omitted).  Nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (citing *Matsushita*, 475 U.S. at 585-86).  The issue of fact must be genuine—plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita,* 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).  The Court's job is not to "weigh the evidence or resolve issues of fact."  *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).  Rather, the Court must decide whether a rational juror could find in favor of the non-moving party.  *Id.*

This case requires that the Court analyze the terms of the Policy to determine their meaning.  In *White v. Continental Cas. Co.*, 848 N.Y.S. 2d 603 (2007), the New York State Court of Appeals provided the following guidance to courts evaluating insurance contracts governed by New York law:

> As with any contract, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court.  It is well settled that '[a] contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion'.  'Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity'.  If the terms of a policy are ambiguous, however, any ambiguity must be construed in favor of the insured and against the insurer.

*White v. Continental Cas. Co.*, 848 N.Y.S. 2d 603, 605 (2007) (citations omitted).

## V.    DISCUSSION

There is no material dispute as to the facts at issue in this case.  Thieves collected and carted away multiple separate loads of Mr. Rokeach's property between mid-June 2011 and the date of their arrest on July 21, 2011.  The evidence suggests that the thefts were linked—the two thieves who were ultimately arrested were seen on the property multiple times; the thieves "staged" material during some trips for removal in other trips; they used the same means to steal the property— pulling up in the same truck in the same location multiple times to load the material.

The Court believes that this linked series of thefts would fall within the Policy's definition of the term "occurrence."  The record supports the conclusion that the series of thefts suffered by the plaintiff were "similar, related . . . acts involving one or more persons."  Policy, Businessowners Coverage Form at p. 45 of 66.  If the defined term "occurrence" applied in the deductible provision, therefore, Mr. Rokeach could make a single claim for a single loss, subject to a single $1,000 deductible.

For that reason, Hanover argues that the term "occurrence" when used in the deductibles provision "is not subject to the definition, and is instead subject to its *usual meaning in a property policy setting*."  Defendant's Reply Memorandum of Law ("Reply"), Docket No. 45, at 2 (emphasis added).  Notably, however, Hanover provides no reference to any law or case that establishes the "usual meaning in a property policy setting" of the term "occurrence."  The question for the Court is whether the undefined term has a clear, unambiguous meaning that precludes the possibility of aggregating a series of related events, as Hanover's argument assumes.

The Second Circuit confronted this issue in a prominent case arising from the events of September 11, 2001.  *World Trade Center Properties, LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154 (2d Cir. 2003), abrogated on other grounds by *Wachovia Bank v. Schmidt*, 126 S.Ct. 941 (2006).  As here, the question in that case was whether the meaning of the undefined term "occurrence" in a first party

8

property insurance policy was ambiguous.  The stakes were much higher in that case than in this

case—many millions of dollars turned on the question of whether the orchestrated terrorist attacks

on the Twin Towers constituted a single occurrence or two separate occurrences.  Still, the analysis

applies equally well to this case, where the question is whether a series of related criminal acts

constituted a single occurrence or multiple occurrences.

The Second Circuit concluded that the use of the undefined term "occurrence" in a first

party property insurance policy was ambiguous, reasoning as follows:

> . . . even if we were to agree with the Silverstein Parties that the approved jury
> instruction and our separate definition of "occurrence" are applicable to this case (a
> question we need not and do not reach), the one thing *Newmont Mines* makes certain
> is that the question of how many occurrences the events of September 11th
> constituted is a question properly left to the fact-finder.  To be sure, a jury could find
> two occurrences in this case, as it did in *Newmont Mines,* or it could find that the
> terrorist attack, although manifested in two separate airplane crashes, was a single,
> continuous, planned event causing a continuum of damage that resulted in the total
> destruction of the WTC, and, thus, was a single occurrence.  Instead of supporting
> the Silverstein Parties' argument that New York law mandates a finding of two
> occurrences under the Travelers binder as a matter of law, *Newmont Mines* confirms
> our belief that *in a first-party property insurance case, the meaning of the undefined term
> "occurrence" is an open question as to which reasonable finders of fact could reach different
> conclusions.*

*World Trade Center Properties, LLC*, 345 F3d at 190 (emphasis added).

Here too, the meaning of the undefined term "occurrence" in the deductibles provision of

the Policy is ambiguous.  There is a reasonable basis for a difference of opinion as to the term's

meaning—particularly as to whether the term permits the aggregation of a series of separate, related

events into a single "occurrence."  Hanover is correct that the term "occurrence" does not appear in

quotation marks in the deductibles provision of the Policy.  As a result, the expansive meaning of

the defined term "occurrence" does not necessarily apply in that context.  However, it is not clear

that the undefined term "occurrence" must be interpreted in a manner that would preclude the

aggregation of multiple visits by a set of thieves to a single property into a single "occurrence"—

indeed, it may be that a jury will determine that the term was meant to be understood in substantially the same way as the defined term.

Because the undefined term "occurrence" is ambiguous, a finder of fact must determine its meaning.  In this case, a jury will determine whether the series of thefts should be understood a single occurrence, subject to a single deductible, or multiple occurrences, subject to multiple deductibles.[3]

## VI.   CONCLUSION

The plaintiff's motion for summary judgment is denied.  The Clerk of Court is directed to close the motion pending at docket number 34.

SO ORDERED.

Dated:  May 19, 2015
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[3] In the event that the term "occurrence" is found to preclude the aggregation of a series of events into a single occurrence, as Hanover argues, the finder of fact will also be able to evaluate how many "occurrences" are at issue, and, therefore, the appropriate deductible amount to be subtracted from the plaintiff's claim.